UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| TORY D. WARD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 2:18-cv-00435-JRS-MJD |
| | ) |
| WEXFORD LLC, | ) |
| BYRD Dr., | ) |
| KIM HOBSON, | ) |
| RITZ Dr., | ) |
| MONICA GIBSON, | ) |
| BARBARA RIGGS, | ) |
| AMY WRIGHT, | ) |
| | ) |
| Defendants. | ) |

**Order Granting and Denying Defendants' Motions for Summary Judgment**

Indiana Department of Correction (IDOC) inmate Tory D. Ward commenced this 42 U.S.C. § 1983 action on September 25, 2018, against the IDOC's contract medical provider and two of its employees for their alleged deliberate indifference to his serious medical needs. Dkt. 2. This action is now proceeding on Mr. Ward's second amended complaint filed July 2, 2019, which added claims against four additional medical provider employees and one IDOC employee. Dkts. 58 & 59. Discovery has concluded. Defendants Wexford of Indiana, LLC, Kim Hobson, Barbara Riggs, and Amy Wright filed their motion for summary judgment on February 24, 2020. Dkt. 108. Defendant Monica Gipson, an IDOC employee, filed her motion for summary judgment on March 3, 2020. Dkt. 114. Mr. Ward has responded to both motions, and replies and surreplies have been filed. Defendants Dr. Samuel Byrd and Dr. Ritz have not moved for summary judgment and the deadline for doing so has passed. *See* dkt. 101. The Court addresses both pending motions for summary judgment in this Order.

## I. Summary Judgment Legal Standard

A motion for summary judgment asks the court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). On summary judgment, a party must show the court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). To survive a motion for summary judgment, the non-moving party must set forth specific, admissible evidence showing that there is a material issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has repeatedly assured the district courts that they are not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before them. *Grant v. Tr. of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017). The non-moving party bears the burden of specifically identifying the relevant evidence of record. *D.Z. v. Buell*, 796 F.3d 749, 756 (7th Cir. 2015). This is in part because summary judgment is the "put up or shut up" moment in a lawsuit. *Grant*, 870 F.3d at 568.

## II. Material Facts

Consistent with the legal standards set out above, the following facts of the case are undisputed except where noted. *Whitaker v. Milwaukee Cnty.*, 772 F.3d 802, 808 (7th Cir. 2014). That is, these statements of fact are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and any disputed evidence are presented in the light most favorable to the non-moving party. *Whitaker v. Wisc. Dep't of Health Servs.,* 849 F.3d 681, 683 (7th Cir. 2017).

Tory D. Ward is an IDOC inmate who at all times material to this action was held at the Wabash Valley Correctional Facility (WVCF) in Carlisle, Indiana. He developed a mass in his left breast sometime in the fall of October 2016. Dkt. 58 at 4; dkt. 110-1 at ¶ 4. After seeing a nurse in early October, he was referred for a physician visit to WVCF physician Samuel Byrd, who saw him either on October 8 or 18, 2016.[1]

At the October physician visit, Dr. Byrd noted no specific pain, nor was there any discharge from Mr. Ward's left nipple. Dkt. 110-2 at ¶ 5. Mr. Ward reported that he had surgery when he was a child to remove his right breast tissue due to a similar issue. *Id.* Mr. Ward denied that the right breast issue was due to cancer. *Id.* Mr. Ward had started taking Zoloft during his incarceration, a medication that he stopped taking 3-4 weeks before his examination with Dr. Byrd. *Id.* Dr. Byrd noted in the medical record that Zoloft was a possible cause of Mr. Ward's condition. *Id.* Dr. Byrd ordered laboratory tests and Mr. Ward gave a blood sample. *Id.*; dkt. 112 at 25, ¶ 8.

---

[1] Dr. Byrd testifies by affidavit that he saw Mr. Ward on October 8, 2016, but he does not cite to an exhibit to support that date. Dkt. 110-1 at ¶ 5. Mr. Ward's affidavit testimony is that the visit took place on October 18, 2016, and he provides a medical record to confirm that date. Dkt. 122 at 25, ¶ 7 (citing dkt. 122 at 38). This particular discrepancy is not material to the resolution of the instant motions but is noted here to highlight the Court's concern for the accuracy of the sworn testimony.

On November 25, 2016, Mr. Ward had not been seen by a medical provider since his October visit with Dr. Byrd. He submitted a health care request on that date, saying his left breast ached and he had pain in it daily. Dkt. 122 at 25, ¶ 8 (citing dkt. 122 at 39). Dr. Byrd then saw Mr. Ward on December 9, 2016, and reported that the lab results were normal except for a small elevation of prolactin. Dkt. 110-2 at ¶ 6. However, a chest x-ray showed that Mr. Ward had "significant gynecomastia."[2] *Id.* Dr. Byrd prescribed ibuprofen for pain and recommended a diagnostic mammogram. *Id.*

Mr. Ward submitted another request for health care on January 9, 2017, reporting continued pain that "comes and goes." Dkt. 122 at 25, ¶ 9. On January 24, 2017, the diagnostic mammogram was performed showing the left-side gynecomastia with a solid mass present and recommended an ultrasound guided biopsy to identify the solid mass. *Id.* at ¶¶ 10-11; dkt. 110-1 at ¶ 8. The biopsy was performed on February 21, 2017, which confirmed the original diagnosis and ruled out cancer. Dkt. 122 at 42; dkt. 110-1 at ¶ 9. It was recommended that Mr. Ward have a surgical consultation. *Id.*

On March 1, 2017, Mr. Ward submitted a health care request asking for the status of his surgical consultation. Dkt. 122 at 26, ¶ 14 (citing to dkt. 122 at 45). Nurse Alecia Huff, who is not a defendant in this action, replied that the consultation "has been approved [and was] awaiting [sic] to be scheduled." *Id.* Nine days later, on March 10, 2017, Mr. Ward submitted another health care request reporting that he was in constant pain on the left side of his chest. Dkt. 122 at 26, ¶ 15 (citing to dkt. 122 at 46). On March 16, 2017, Nurse Huff replied that "You have been approved

---

[2] Gynecomastia is defined by the National Institute of Health as the "benign enlargement of male breast glandular tissue." *See* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3987263/ (last visited August 13, 2020). It is the most common breast condition in males, affecting 30% of the male population. *Id.*; dkt. 110-1 at ¶ 7.

[and] scheduled for an appointment with a breast surgeon." Dkt. 122 at 46. On April 3, 2017, Mr. Ward submitted another health care request reporting that he was still suffering with "pain and aches" daily and noted his hospital appointment had been cancelled due to a quarantine. Dkt. 122 at 26, ¶ 16 (citing to dkt. 122 at 47). The next day, Nurse Huff replied that "[t]his has been addressed [and] appt has been rescheduled." Dkt. 122 at 47.

Mr. Ward wrote a letter to defendant Kim Hobson on or about April 10, 2017, notifying her that he had been writing to "medical" but had not yet been "accommodated" for his chest issue that caused constant pain. Dkt. 122 at 26, ¶ 17 (citing to dkt. 122 at 48). Ms. Hobson replied that "your appointment is rescheduled very soon." *Id.*

The surgical consultation was conducted on May 1, 2017, at Eskenazi Hospital. Dkt. 122 at 26, ¶ 18 (citing to dkt. 122 at 49-50).[3] Dr. Ivan Hadad, a plastic surgeon, recommended a left breast mastectomy, writing that it was medically necessary. *Id.* On May 2 and May 8, 2017, Dr. Mary Chavez, the WVCF medical site director, requested approval for Mr. Ward's surgery. Dkt. 122 at 26-27, ¶¶ 19-20 (citing to dkt. 122 at 51-52).

On June 6, 2017, Mr. Ward sent a request for health care to Dr. Byrd reporting that he was still experiencing pain and aching and asked about the status of the surgery request. Dkt. 122 at 27, ¶ 21 (citing to dkt. 122 at 53). He sent two more health care request forms, on June 11 and 14, 2017, reporting that he was in major pain but had not received treatment. Dkt. 122 at 27, ¶¶ 22-23. On June 19, 2017, Mr. Ward received a response telling him that his records had been sent to the specialist, but that the medical records clerk was on vacation. Dkt. 122 at 56. It was also reported

---

[3] Dr. Byrd testifies by affidavit that this consultation occurred in April 2017. Dkt. 110-1 at ¶ 9. The record citation provided by Mr. Ward clearly shows the consultation was done May 1, 2017.

that "we are doing as much as we can for the time being." *Id.* Dr. Byrd replied on June 21, 2017, that the surgery request was "[w]aiting response." *Id.* at 53.

On the same date that Dr. Byrd told Mr. Ward that an approval for the surgery was still awaiting a response, he had a "collegial discussion" with another IDOC physician, Dr. Ritz, about Dr. Hadad's surgery recommendation. Dkt. 110-1 at ¶ 11. Dr. Byrd testifies:

> We discussed the relevant medical history, noting the Plaintiff had inconsistent and mild symptoms, and that the prior biopsy and mammogram confirmed the presence of gynecomastia, as opposed to any invasive cancerous cells. It was our decision that the Plaintiff did not medically require surgical removal of the breast tissue. There was no indication that Plaintiff had any significant limitations of his activities of daily living, his mild symptoms were reportedly controlled by over-the-counter pain medication, and the biopsy/mammogram had already ruled out concerns for invasive cancerous cells. As such, the decision was made that removal of the breast tissue was not medically necessary, and instead amounted to a cosmetic procedure.

Dkt. 110-1 at ¶ 11.

Prior to this conversation with Dr. Ritz, Dr. Byrd had a conversation with defendant Monica Gipson, an IDOC employee who was the Director of Medical and Clinical Services. The medical record of June 21, 2017, contains Dr. Byrd's reference to this conversation and a narrative explaining why the mastectomy surgery request should be denied. This narrative states, in relevant part:

> Prior discussion w/ Monica Gipson (the client) is that this type of surgery would be considered elective and cosmetic and should not be approved. The case was discussed in collegial w/ Dr. Byrd and Dr. Ritz 06/23/17 the surgery was not approved based on the opinion of the client and the opinion of the clinicians on the collegial call that the surgery is elective and cosmetic.

Dkt. 122 at 57.

Dr. Byrd met with Mr. Ward on August 1, 2017, to inform him of the decision to deny the surgery. Dkt. 110-1 at ¶ 12. Mr. Ward then reported that he had "symptoms of discomfort as well

6

as clear drainage from the nipple." *Id.* Dr. Byrd did not know why he was hearing these symptoms for the first time but testifies that it did not change his opinion that surgery was unnecessary. *Id.*

Mr. Ward testifies that he submitted several requests for health care in July, August, and September 2017 reporting his pain but he was never seen by a medical provider. Dkt. 122 at 28. Dr. Byrd, however, testifies that after his August 1, 2017, visit with Mr. Ward, he did not see him for "well over a year," and that during this time Mr. Ward complained of pain on only one occasion during a January 12, 2018, nurse sick call. Dkt. 110-1 at ¶ 13.

On October 1, 2017, Mr. Ward made an informal grievance that Wexford had denied a surgery that he asserts its predecessor, Corizon, had approved and that he remained in pain. Dkt. 122 at 28, ¶ 27 (citing to dkt. 122 at 58). He was told he had used the wrong form for this grievance. *Id.* Mr. Ward resubmitted his grievance on a different form. Dkt. 122 at 28, ¶ 28.

On January 9, 2018, Mr. Ward submitted a request for health care reporting constant pain in his left breast, making him feel he was in danger, and causing him to feel numb from the lump to his back. Dkt. 122 at 28-29, ¶ 30 (citing to dkt. 122 at 60). He was seen by a medical provider on January 12, 2018, when his vital signs were taken but no other treatment was provided. *Id.*

From February to May 2018, Mr. Ward sent multiple requests for health care to medical personnel stating he was in pain and needed medical attention. Dkt. 122 at 29, ¶ 31. None were acted on. *Id.*

On July 15, 2018, Mr. Ward sent another health care request form reporting pain at a level 7 on a 10-point scale and stating that he was unable to lay on his chest. Dkt. 122 at 29, ¶ 32 (citing to dkt. 122 at 61). He saw a nurse two days later who referred him to Dr. Byrd. *Id.* Mr. Ward did not see Dr. Byrd until November 7, 2018, after Dr. Byrd had been notified of Mr. Ward's lawsuit. Dkt. 122 at 29, ¶ 33 (citing to dkt. 110-1 at ¶ 14),

This lawsuit was filed September 25, 2018. Dkt. 2. When Dr. Byrd was notified of Mr. Ward's allegations, he noted that he had not seen Mr. Ward for over a year and therefore scheduled him for a visit that occurred on November 7, 2018. Dkt. 110-1 at ¶ 14.

At this visit, Dr. Byrd again noted the presence of a small lump around the left breast that was consistent with the earlier examinations. *Id.* Mr. Ward reported that the lump size seemed to change with his weight, which is typical for gynecomastia. *Id.* He told Dr. Byrd that his pain was under control with Tylenol. *Id.* Dr. Byrd observed that lump was approximately 3.5 cm by 2 cm, slightly larger than when the ultrasound was done. *Id.* Therefore, Dr. Byrd ordered another ultrasound and laboratory tests. *Id.* Dr. Byrd testifies that his plan is to refer Mr. Ward back to the surgeon if the gynecomastia has grown. *Id.* Dr. Byrd also continued the prescription for Tylenol and encouraged Mr. Ward to lose weight. *Id.*

Three days after this visit with Dr. Byrd, Mr. Ward submitted an appeal concerning his grievance stating that he was still in pain that has lasted sixteen months and that he was developing severe mental anguish. Dkt. 122 at 28, ¶ 29 (citing to dkt. 122 at 59).

On January 31, 2019, Mr. Ward submitted another request for health care stating that he was still awaiting the additional ultrasound and laboratory tests that Dr. Byrd had ordered on November 7, 2018. Dkt. 122 at 29, ¶ 34 (citing to dkt. 122 at 62). He also reported that he was taking up to 10 Tylenol per day and was sick with stomach pain. *Id.* On February 5, 2019, a reply was provided that said Mr. Ward had been approved for a consultation with Dr. Hadad. *Id.*

Mr. Ward had written to the American Civil Liberties Union of Indiana (ACLU) in January 2018. An ACLU attorney wrote to the IDOC the same month to inquire about Mr. Ward's medical care. The ACLU letter was forwarded to Nikki Tafoya, the Quality Assurance Manager for IDOC Health Services. Over a year after receiving the ACLU letter, Ms. Tafoya wrote to the ACLU on

January 29, 2019, and reported that after studying Mr. Ward's records and having further discussions with the physician, it had been decided to go forward with the mastectomy surgery. Dkt. 122 at 29-30, ¶ 35 (citing to dkt. 122 at 63).

On March 17, 2019, Mr. Ward submitted another request for health care reporting that he still had pain, had developed spasms, and that Tylenol was no longer effective. Dkt. 122 at 30, ¶ 37 (citing to dkt. 122 at 66). Nurse Riggs replied that laboratory tests had been scheduled and the surgery had been approved. *Id.*

Mr. Ward had the mastectomy sometime after March 17, 2019, and before June 9, 2019.

On June 9 or 10, 2019, Mr. Ward submitted a health care request reporting that he just had surgery and that his left nipple was bleeding, breaking apart, and that he was in pain, possibly from a spider bite. Dkt. 122 at 30, ¶ 38 (citing to dkt. 122 at 67). When he was later summoned to nurse sick call, he was in the law library. Dkt. 122 at 30, ¶ 39. Mr. Ward left his belongings in the library and went to the medical appointment, but after waiting twenty minutes, he told Nurse Riggs that his nipple was bleeding and he was in pain. *Id.* When she told him he would have to wait, Mr. Ward acknowledged that but said he needed to retrieve his belongings from the library. *Id.* After he did so and returned to the medical appointment, Nurse Riggs refused to see him. *Id.* He signed a refusal form at the suggestion of a correctional officer as a way to document the incident. *Id.*; *see also* dkt. 122 at 68.

On June 14, 2019, Mr. Ward told a correctional officer that his left nipple was bleeding and falling apart. Dkt. 122 at 31, ¶ 41. He showed his nipple to the officer and another inmate and told them he thought it was an emergency. *Id.* The officer contacted medical providers and explained the emergency, and then told Mr. Ward that Nurse Riggs refused to see him. *Id.*

9

Additionally, the officer told Mr. Ward that Nurse Amy Wright also refused to see him without his first submitting a request for health care. *Id.*

The officer contacted Mr. Ward's counselor who looked at Mr. Ward's nipple and called the medical office, verifying it was an emergency situation. *Id.* Again, Nurse Riggs refused to see Mr. Ward. *Id.* The inmate who witnessed the first portion of these events, Caleb Bixler, submitted an affidavit supporting Mr. Ward's factual assertions. Dkt. 122 at 34.

Mr. Ward submitted a grievance to Nurse Wright concerning being denied medical care on June 11 and 14, 2019. Dkt. 122 at 32, ¶ 43 (citing to dkt. 122 at 70). Her reply said that he had refused treatment by going to the law library and made no mention of the emergency situation. *Id.*

Mr. Ward lost his left nipple, which he believes is due to a denial of care. Dkt. 122 at 33, ¶ 45.

On July 2, 2019, a second amended complaint incorporating the defendants and allegations occurring after the original complaint was filed. Dkt. 58.

Defendant Kim Hobson, a registered nurse, was an employee of Wexford and worked as the Health Services Administrator at WVCF. By affidavit, Ms. Hobson testifies that she does not recall ever having an in-person interaction with Mr. Ward. Dkt. 110-2 at ¶ 3. She recalls no involvement with his treatment or referrals. *Id.* at ¶ 7. The summary judgment record, however, shows that Ms. Hobson responded to a letter from Mr. Ward asking if a doctor visit could be scheduled "as soon as possible." Her response was "your appointment is rescheduled very soon." Dkt. 122 at 48. This is the only reference to Ms. Hobson in the summary judgment briefs and exhibits.

Defendant Amy Wright, a registered nurse, was employed by Wexford at WVCF. By affidavit, Ms. Wright testifies that she does not recall any face-to-face visits with Mr. Ward, although she responded to one of his informal written requests. Dkt. 110-3 at ¶¶ 4, 6. Essentially, Ms. Wright informed Mr. Ward that the off-site specialist's office set the appointment dates for IDOC patients. *Id.* at ¶ 6.

On or about June 18, 2019, Ms. Wright received a letter submitted by Mr. Ward which he labeled an informal grievance. In this letter, Mr. Ward indicated that he was in need of medical attention for his breast, and that Nurse Bobbi Riggs was refusing to see him. When she reviewed the medical records, she saw that Mr. Ward had been seen and treated for his complaints by another nurse and physician. *Id.* at ¶ 7.

Barbara Riggs, a registered nurse, was employed by Wexford at WVCF. Dkt. 110-4 at ¶ 2. Concerning the June 2019 incident that Mr. Ward described above, Ms. Riggs asserts the following: She saw Mr. Ward sitting in a waiting area, and he asked her why he had been scheduled to be seen when he was in the law library. She informed Mr. Ward that they did not schedule medical appointments around inmate schedules and they can choose which count letter (law library or medical) they go to. At that time, Mr. Ward indicated he was going back to the law library, which Ms. Riggs explained was fine, but she would need a refusal, in light of his choice to go to the law library. Later during that shift, Ms. Riggs returned to the waiting area to call Mr. Ward and learned that he had left the health care waiting area to go the law library. Ms. Riggs advised the correctional officer in the waiting area that she would like a signed refusal. At some point later, Ms. Riggs was provided a copy of Mr. Ward's signed refusal form, in which he indicated that he did not deny or refuse treatment but was called for treatment during his law library time which was very limited. *Id.* at ¶ 6.

Monica Gipson testifies by affidavit that while serving as the IDOC Director of Medical and Clinical Services she had oversight of the medical vendor contract. Dkt. 114-1 at ¶ 2. She testifies that in this position she did not make health care decisions for offenders, she relied on the healthcare providers to provide appropriate and necessary care, and the treatment decisions for offenders are made by providers employed by Wexford. *Id.* at ¶¶ 4, 7, & 8. Ms. Gipson further testifies that she is aware of Mr. Ward's allegations, and that she "never had any personal involvement with him or the decisions of his medical care providers." *Id.* at ¶ 10. She also testifies that she has "never denied, delayed, or interfered, with [Mr. Ward's] receipt of medical care." *Id.*

Ms. Gipson, in her reply, testifies again by affidavit and avers that she "provided clarification between elective and medically necessary surgical procedures," but still maintains that Dr. Byrd had already determined that Mr. Ward's surgery was not medically necessary. Dkt. 124-1 at ¶¶ 6 & 9.

### III. Discussion

To prevail on an Eighth Amendment deliberate indifference medical claim, a plaintiff must demonstrate two elements: (1) that he suffered from an objectively serious medical condition; and (2) that the defendant knew about the plaintiff's condition and the substantial risk of harm it posed, but disregarded that risk. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Pittman ex rel. Hamilton v. Cnty. of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014).

For purposes of summary judgment, the medical defendants concede that Mr. Ward's condition could be a serious medical condition. Dkt. 109 at 16. Defendant Gipson does not address this question. Accordingly, for summary judgment purposes, the medical issues suffered by Mr. Ward are serious medical needs as defined by federal constitutional law.

The remaining analysis is whether a reasonable trier of fact could find that the defendants knew about Mr. Ward's condition and the substantial risk of harm it posed but disregarded that risk. None of the defendants have argued they did not know about Mr. Ward's gynecomastia or that they were unaware it was causing him pain. Their argument is that they did not disregard his medical needs.

The Court is first concerned with the testimony by affidavit of defendant Gipson. In her motion for summary judgment, she testifies under oath that she "never had any personal involvement with him or the decisions of his medical care providers." Dkt. 114-1 at ¶ 10. But co-defendant Dr. Byrd's medical record reports that she did, in fact, have a conversation with him about whether Mr. Ward's surgery would be cosmetic or medically necessary. Dkt. 122 at 57. And Dr. Byrd noted in that record that Mr. Ward's surgery would not be approved due, in part, to the "opinion of the client." *Id.* The client was identified in Dr. Byrd's note as Ms. Gipson. *Id.* The medical record directly contradicts Ms. Gipson's testimony. In the medical providers' summary judgment reply, they do not contest the accuracy of Dr. Byrd's medical record. But in Ms. Gipson's reply, she attaches a second affidavit, this time testifying that she "provided clarification between elective and medically necessary surgical procedures," apparently now admitting that she did, in fact, have personal involvement with the decisions of his medical care providers.

On the undisputed factual record a reasonable trier of fact could conclude that Ms. Gipson was a participant in the decision to deny Mr. Ward's surgery, a decision that postponed the eventual surgery for more than a year. During this year, Mr. Ward continued to experience physical pain and emotional distress, results that could have been foreseen. The trier of fact could conclude that Ms. Gipson was deliberately indifferent to Mr. Ward's serious medical needs. Ms. Gipson's motion for summary judgment, dkt. [114], is **denied**.

Mr. Ward has presented evidence that on two occasions shortly after his mastectomy, Nurse Barbara Riggs refused to provide him emergency medical care when he reported that his left nipple was bleeding and breaking apart and he was in pain. Dkt. 122 at 67-69, 72-73. A reasonable trier of fact could conclude that Nurse Riggs' failure to provide Mr. Ward some kind of medical treatment for his torn and bleeding nipple with accompanying pain were instances of deliberate indifference to Mr. Ward's serious medical needs. Barbara Riggs' motion for summary judgment, dkt. [108], is **denied**.

Nurse Amy Wright is alleged to have also refused to provide emergency medical attention to Mr. Ward when he sought treatment for his torn and bleeding nipple and pain. Mr. Ward asserts that she provided instructions that he was required to first submit a written request for health care before he would be seen. Dkt. 122 at 72-73. A correctional officer and a counselor are believed to have tried to intercede on Mr. Ward's behalf and assure the nurses that the matter was an emergency, but Nurse Wright and Nurse Riggs still refused to see him. A reasonable trier of fact could also conclude that Nurse Wright was deliberately indifferent to Mr. Ward's serious medical needs, and therefore her motion for summary judgment, dkt. [108], is **denied**.

Mr. Ward pleaded that defendant Wexford of Indiana, LLC, has a policy or practice of not approving treatment by outside providers, and requiring inmates who seek emergency medical treatment to first complete a request for health care. Dkts. 58 & 112. It is true, as Wexford argues, that Mr. Ward cannot identify a specific policy of Wexford's to deny inmates adequate medical care. But the Court gives Mr. Ward, as the non-movant, the benefit of all reasonable inferences in assessing the dispositive motions. Mr. Ward has provided evidence that while inmate medical care was delivered by contractor Corizon Health, Dr. Byrd and other physicians had recommended he have the mastectomy surgery and they were awaiting approval for their request. They were

apparently acting on Dr. Hadad's assessment that the mastectomy was medically necessary. But after Corizon's contract expired and Wexford took over inmate medical care, Dr. Byrd had a conversation with Ms. Gipson, and then he and Dr. Ritz concluded that the surgery was not medically necessary and would be denied.

Given that a 180-degree turn in the assessment of whether Mr. Ward's requested surgery was medically necessary at the very time Wexford took over the medical contract, and given that at least the surgery consult had been approved by Corizon, though the surgery itself had not yet been approved, a reasonable trier of fact could conclude that Wexford has an unwritten but effective policy, practice, habit, or custom of routinely denying outside medical procedures. *See Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658 (1978); *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 378-79 (7th Cir. 2017) (en banc). Defendant Wexford of Indiana, LLC's motion for summary judgment, dkt. [108], is **denied**.

In his complaint, Mr. Ward identifies Nurse Kim Hobson among a group of defendants who were deliberately indifferent to his serious medical needs. Dkt. 58. But he does not plead what exactly her actions or inactions were. Nurse Hobson's testimony is that she had nothing to do with Mr. Ward's medical care and does not recall ever meeting him. Dkt. 110-2. The record reflects, however, that Nurse Hobson once responded to one of Mr. Ward's requests for health care, but she replied with a positive answer to his question. Dkt. 122 at 48. There is no denial of medical care or delay of treatment evidenced by Nurse Hobson's response. Mr. Ward has not provided evidence of any other personal involvement by Nurse Hobson in his medical care. Accordingly, no reasonable trier of fact could find that Nurse Hobson violated Mr. Ward's Eighth Amendment rights. Nurse Hobson's motion for summary judgment, dkt. [108], is **granted** and all claims against her are **dismissed** with prejudice.

### IV. Conclusion

For the reasons explained above, the motion for summary judgment of Monica Gipson, dkt. [114], is **denied**; the motion for summary judgment of Kim Hobson, dkt. [108], is **granted** and all claims against her are **dismissed** with prejudice. The motions for summary judgment of Wexford of Indiana, LLC, Barbara Riggs, and Amy Wright, dkt. [108], are **denied**. No partial final judgment is necessary at this time.

Because this case will be resolved by settlement or trial, the medical defendants' July 7, 2020, motion for a settlement conference, dkt. [127], is **granted**. The Magistrate Judge is requested to conduct a settlement conference, by telephone if possible, at his earliest convenience to explore the possibility of settlement. The Magistrate Judge is further requested that, in the event the case is not settled, to conduct a status conference to determine what remains to be completed for trial. The Court will schedule a final pretrial conference and jury trial by separate order.

**IT IS SO ORDERED**.

Date: 9/30/2020

_____
JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana


Distribution:

Tory D. Ward
259014
Wabash Valley Correctional Facility - Inmate Mail/Parcels
Electronic Service Participant – Court Only

Douglass R. Bitner
Katz Korin Cunningham, P.C.
dbitner@kkclegal.com

Brandon Alan Skates
Indiana Attorney General
brandon.skates@atg.in.gov

Margo Tucker
Indiana Attorney General
margo.tucker@atg.in.gov

By electronic delivery:
    The Honorable Mark J. Dinsmore
    United States Magistrate Judge